**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE** |
| | **:** | **NO.  1:09-CR-00361-RWS-AJB** |
| **JOSE EDENILSON-REYES,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**ORDER FOR SERVICE OF**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b).  A copy of the R&R and this order shall be served

upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within **fourteen (14)** days of service of this Order.  Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and shall be served upon the opposing

party.  *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990).  The party

filing objections will be responsible for obtaining and filing the transcript of any

evidentiary hearing for review by the District Court.  If no objections are filed, the

R&R may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review.  *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  25th  day of   October  , 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE** |
| | **:** | **NO.  1:09-CR-00361-RWS-AJB** |
| **JOSE EDENILSON-REYES,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**UNITED STATES MAGISTRATE JUDGE'S
<u>FINAL REPORT AND RECOMMENDATION</u>**

Currently before the Court are Jose Edenilson-Reyes' Preliminary Motion to Suppress Search and Seizure and Statements Made by the Defendant, [Doc. 175], and Particularized Motion to Suppress Search and Seizure and Statements Made by Defendant, [Doc. 188].  The Court held an evidentiary hearing concerning these motions on July 22, 2010, [*see* Docs. 277, 282 (hereinafter "T1:__")], and on July 27, 2010, [*see* Docs. 279, 283 (hereinafter "T2:__")].  Following the evidentiary hearing, the parties filed briefs.  [Docs. 285 (Government), 287 (Defendant), 289 (Government)].  For the reasons discussed below, the undersigned **RECOMMENDS** that the defendant's motions, [Docs. 175, 188], be **DENIED**.

*Introduction*

On July 29, 2009, a grand jury returned a seven-count indictment, [Doc. 42], which was then superseded on August 25, 2009, by an eight-count superseding indictment [Doc. 82].   This superseding indictment charged sixteen individuals, including Jose Edenilson-Reyes ("Reyes" or "the defendant").   The defendant was charged in two of the eight counts as follows: (1) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h) (Count 4); and (2) money laundering, in violation of 18 U.S.C. §§ 2, 1956(a)(2)(A) (Count 5).[1]   [Doc. 10].   The defendant then filed a preliminary motion to suppress evidence and statements, [Doc. 175], which was followed by a particularized motion to suppress, [Doc. 188].   In these motions, the defendant seeks to suppress evidence and statements from a September 3, 2008, traffic stop because of alleged violations of his Fourth and Fifth Amendment rights. [*See* Docs. 175, 188].   The undersigned held an evidentiary hearing on the motions to suppress on July 22, 2010, [Docs. 277, 282], and on July 27, 2010, [Docs. 279, 283]. The government filed its post-hearing brief on August 31, 2010, [Doc. 285], and the

---

[1]     The superseding indictment also contains a forfeiture provision. [*See* Doc. 82 at 12-16].

2

defendant filed a response on September 10, 2010, [Doc. 287]. The Government then filed a reply on September 21, 2010. [Doc. 289].

**Facts**

A.   *Investigation of Mexican Drug Organization*

Michael Blevins, a Narcotics Detective with the Lawrenceville, Georgia, Police Department and a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA"), began investigating a Mexican-based drug trafficking organization in November 2007. T1:8, 9-10. Blevins, as co-case agent of the investigation, initiated the first wiretap in February 2008. T1:10. During the course of the investigation, the DEA learned about an unidentified male, known as "Daniel," who was the head of the Atlanta-based cell of the Mexican organization. T1:10. Around August 26, 2008, law enforcement sought and received authorization to tap Daniel's phones. T1:45. The operation run by Daniel operated as follows: drugs would be transported from Mexico to Atlanta; the narcotics would be turned over to Daniel who would distribute the narcotics in Atlanta and to other States; and Daniel would collect the proceeds and coordinate their delivery to Texas. T1:10-11. As of September 3, 2008, Blevins'

AO 72A
(Rev.8/8
2)

investigation had not led to the seizure of either drugs or money from Daniel's organization.  T1:46.[2]

   B.   *Surveillance on September 3, 2008*

   On September 3, 2008, Blevins along with other officers had set up surveillance at Daniel's apartment in Lawrenceville.  T1:12.  Also on this date, the DEA was monitoring Daniel's phone calls pursuant to the court authorized wire tap.[3]  T1:12-13.  Through the wire tap, the agents learned that currency would be turned over to a truck driver.  T1:13.  Specifically, at 3:36 p.m., Daniel phoned an individual (later identified as the defendant) who informed Daniel that he wanted to meet at a "quiet" industrial park at I-285 and Hollowell Parkway.  T1:14.  At 5:29 p.m., Daniel confirmed the location and advised the defendant that he was heading over to the location.  T1:15-16.  Daniel contacted Reyes at 6:23 p.m. to advise him that "the guy" would be ready, who the officers believed was a runner for Daniel.  T1:16.  Daniel called Reyes at 7:06 p.m. to indicate that the runner was almost there and to confirm the location.  T1:16-17.  At 7:16 p.m., Reyes provided directions to Daniel as to his precise location in the

---

   [2]   Blevins' investigation did reveal other targets who used similar locations and means to unload drugs that arrived by tractor trailer.  T2:29-31.

   [3]   The phone calls were being monitored by Spanish-speaking DEA contractors who were in contact with the agents over the phone.  T1:13.

4

industrial park.  T1:17.  At this time, Daniel indicated that his runner would be in a gray car, which surveillance identified as a gray Volkswagen Jetta, and Reyes revealed that he was in a red tractor trailer.  T1:18.

After Daniel's first phone call to the defendant, most of the officers moved to a Petro Station at Hollowell Parkway and I-285 around 4:45 p.m.  T1:12.  Law enforcement also began performing surveillance by helicopter, whose passenger - - Mark Floyd, an observer[4] in the aviation wing of the DEA - - was in radio contact with the ground surveillance.  T1:18, 19, 47, 54.  At 7:18 p.m., Floyd indicated that the silver Jetta had pulled along side of the truck and had placed a dark-colored suitcase into the driver's side of the truck cab.  T1:20, 49.  Floyd's view was obstructed by the tree line.  T1:49; *see also* Aerial footage at 9:58-10:37 in Gov't Exh. 1.  The transfer lasted less than a couple of minutes.  T1:37, 50.

At 7:26 p.m., Daniel called Reyes to see if he was set, and Reyes indicated that he had received it.  Reyes asked Daniel how many "popsicles" were delivered, and Daniel advised that there should be 39.  T1:21; T2:31; *see also* Line Sheet at Def't Exh. 1(i).  Blevins believed that Daniel and the defendant were discussing the number

---

[4]         An observer shoots video, takes still photography, and reports surveillance from the air.  T1:48.

of bundles of money in the suitcase.  T1:22.  One minute later, another intercept revealed Daniel, who was speaking to a female, confirming that there were 39 envelopes, one of which was payment.  T1:22.  The conversations between Reyes and Daniel did not refer to narcotics.  T1:34.

Blevins relayed the information to several Georgia State Patrol officers about the intercepted telephone calls, the suitcase exchange, the presence of 39 bundles, and the description of the truck.  T1:22-23, 24.  Blevins requested that the state patrol conduct a traffic stop based on independent probable cause and try to get consent to search the truck.  T1:23, 24, 43.  Blevins indicated that there should not be any arrest unless it was necessary.  T1:24.

### C.    Traffic Stop

James Thompson of the Georgia State Patrol was assigned to assist the DEA with the traffic stop.  *See* T1:60.  Thompson was told that the truck was transporting drug proceeds.  T1:61.  Thompson positioned his patrol car in the median on I-20 beneath a bridge.  T1:61; *see also* Aerial footage at 53:02 in Gov't Exh. 1; T1:65.  The driver's side window of his patrol car was down.  T2:17.  Thompson learned of the truck's identity when it was passing his patrol car and when he "pulled out on it."  T1:63.  As

6

AO 72A
(Rev.8/8
2)

the truck passed the patrol car, Thompson heard the "wheels pounding,"[5] which was a "strong indication" of a tire violation, meaning that the truck tires did not have sufficient tread. T1:63, 66. At this time, Thompson was approximately 12 feet away from the truck as it passed. T1:64. He immediately pulled out after the truck passed, and he slowly caught up to the truck. T1:66, 67.

Blevins, who was in a black Toyota 4Runner, followed the defendant on I-20[6] and eventually positioned the Toyota in front of the defendant's truck as the truck approached the state patrol. T1:25; *see also* Aerial Footage at 53:24-53:44 in Gov't Exh. 1. Thompson was unaware that there was an agent in the 4Runner as the truck and 4Runner passed him. T1:66. As Thompson was driving along side the truck to visually determine whether the tires were running smoothly, Thompson noticed that the

---

[5]     Thompson explained that legally compliant tires would make a smooth sound on the road whereas a noncompliant tire would make a pounding noise at it traveled over the road. T1:63-64. Thompson also indicated that stops for tire violations were common because noncompliant tires would shred and leave debris in the roadway. T1:65.

[6]     The aerial surveillance on the truck was continuous from the time of the transfer with the silver Jetta to the time of the traffic stop. *See* T1:52-53; *see also* Aerial footage at 10:38-55:18.

7

defendant was driving too close to the 4Runner.  T1:68; *see* Aerial Footage at 54:14-54:34 in Gov't Exh. 1.[7]

Thompson then stopped the defendant's truck at approximately 8:09 p.m. T1:41, 69-70.  As Thompson approached the cab, the defendant exited the truck and met Thompson.  T1:71.  When the defendant asked why he had been stopped, Thompson told him that he was following too closely and that he had a tire issue. T1:71-72.  Thompson initially indicated that the defendant was driving too close.  *See* Traffic Stop Video ("Gov't Exh. 2") at 1:51-2:08.  Thompson had the defendant return to the truck because Thompson needed his insurance and registration.  Thompson also asked to see the bill of lading and the logbook.  T1:71.  Approximately, one minute later, he told the defendant that his tires were "beating" and indicated the reason why. Gov't Exh. 2 at 2:54-3:00.

Thompson moved the defendant in front of the patrol car and examined the defendant's paper work and asked him questions about the truck's load, the trucking business, and his family.  T1:76-77; Gov't Exh. 2 at 3:06-7:40.  Thompson did not

---

[7]   Once Agent Blevins pulled in front of the defendant's truck, Blevins drove at what appears to be a normal speed, *see* Aerial Footage at 53:41-54:10 in Gov't Exh. 1, before noticeably slowing down the 4Runner as Trooper Johnson approached, *see id.* at 54:15-54:33.

AO 72A
(Rev.8/8
2)

handcuff or restrain the defendant.  T1:77.  The defendant spoke decent English and understood Thompson.  T1:79; *see generally* Gov't Exh. 2.

Thompson examined the tires as he approached the passenger side of the truck. T1:79.  When backup arrived, Thompson also examined the tires on the driver's side. T1:80; Gov't Exh. 2 at 7:42-8:19.  The truck had two bad tires, one on each side of the cab, which were very "slick," meaning that there were flat spots without any tread on the tire.  T1:80, 81; *see also* Gov't Exhs. 3-4.

Two other officers arrived at the scene - - Trooper Jeater and Sergeant Mark Mitchell.  T1:84.  They both arrived in separate cars, so there were three officers and three patrol cars present.  T2:8.  Also, there was a K-9 present.  T2:9.  The cars were all behind the truck, and the officers were all armed.  T2:9.  After these other officers arrived, Thompson entered his patrol car  to run the license and registration, to check the defendant's criminal status through BLOC,[8] and to start working on the paperwork. T1:85, 86, 87; *see also* Gov't Exh. 2 at 9:16-19:14.  Thompson had to wait for a response from BLOC.  T1:86.  While Thompson was in the car, the defendant was in front of the vehicle with Trooper Jeater standing next to him.  T1:86.

_____

[8]      BLOC is an acronym for Blue Lighting Operation Center, which provides information concerning border crossings, criminal histories, and investigations about the driver or the truck.  T1:86.

9

When Thompson exited his patrol car, he gave the defendant his documents, asked the defendant questions, and worked on filling out a ticket for the tire violations and a warning for following too closely.  T1:88, 90; *see also* Gov't Exh. 2 at 19:26-24:06; Exh. 5 (ticket), Exh. 6 (warning).  Thompson asked about, and the defendant denied, the presence of explosives, firearms, a large amount of currency, and narcotics in the truck.  Gov't Exh. 2 at 23:26-23:55.  At 24 minutes into the stop, BLOC called Thompson to inform him that the defendant did not have a criminal history, but that the defendant and the truck had made a recent border crossing.  T1:91; Gov't Exh. 2 at 24:02-25:15.

At 29 minutes into the traffic stop, Thompson sought the defendant's request to search the truck immediately after issuing a ticket and warning and returning the documents to the defendant.  T1:91-92; Gov't Exh. 2 at 29:30.  The defendant provided verbal and written consent.  T1:92; Gov't Exh. 2 at 29:33-29:38; 29:48-31:02.  The defendant signed a Spanish-language version of the Georgia State Patrol Consent to Search form.  T1:92; Gov't Exh. 7.[9]  Before signing the form, the defendant looked

_____

[9]     The English version of the consent form, which was correctly translated into Spanish, T1:93, provided that: (1) the defendant gave his consent to the officers on the scene to search the vehicle, including the luggage and containers and including the removal of suspicious panels or components; (2) the defendant had the right to refuse to consent; and (3) the consent was not made through threats, force, or promises. *See*

10

AO 72A
(Rev.8/8
2)

over it long enough to suggest that he was reading it.  T1:93; Gov't Exh. 2 at 30:23-31:00.  Thompson also informed the defendant that if he did not understand the form, he should not sign it, but that if he understood the form, he should go ahead and sign.  T1:93; Gov't Exh. 2 at 30:03-30:17.  The defendant appeared to understand the form, and he did not appear to be under the influence of drugs or alcohol.  T1:94.  Thompson backed away from the defendant while he reviewed the form and pointed a flashlight at the form so that the defendant could read and sign the form.  T1:94; Gov't Exh. 2 at 30:23-31:02.  No one at the scene made promises, displayed weapons, made threats, or spoke in abusive tones.  T1:96; Gov't Exh. 2 at 29:33-31:02.

A search of the truck revealed a suitcase containing bundles[10] of United States currency that was situated on the bottom bunk in the sleeper area of the cab.  T1:97; Gov't Exhs. 10-11.  After finding the suitcase, Thompson and Mitchell approached the defendant and asked him a series of questions about the suitcase in front of the patrol car while Trooper Jeater stood to the side of the defendant.  *See* Gov't Exh. 2 at 34:29-37:32.  The defendant was standing and leaning against the patrol car's hood.  He was

---

Gov't Exh. 7.

[10]    Ultimately, the officers counted 39 bundles of money in the suitcase.  *See* Gov't Exh. 2 at 1:13:23-1:13:29, 1:14:28-1:14:30.

11

not restrained or handcuffed.  T1:101.  The defendant indicated that he did not know what was in the suitcase and that the suitcase did not belong to him.  T1:101-02.  He also denied owning the money when it was shown to him.  T1:110.  He stated that he received the suitcase from an individual at the plant where he picked up the truck's load and was transporting the suitcase for the individual to Laredo, Texas.  T1:104.  Thompson did not yell at the defendant or threaten him while asking about the suitcase.  T1:102.  The officers did not unholster or point their weapons at him.  T1:102.  The officers did not touch the defendant or make promises to him.  T1:103.  The defendant did not ask to leave or indicate that he would not answer the questions, and he instead seemed willing to answer questions.  T1:103-04; *see also* Gov't Exh. 2 at 34:29-35:53; 36:10-37:29, 49:36-49:55, 56:18-56:21; 1:02:50-1:04:58.

After the initial round of questions, the defendant asked to get his cigarettes, and Thompson said that he would get them for the defendant.  *See* Gov't Exh. 2 at 37:30-34.  When the defendant asked to get his phone to call his wife, Thompson responded, "No phone yet," but Thompson indicated that the defendant would be allowed to get his phone  *Id.* at 37:35-37:44.  Thompson added that at that time, he did not see anything that the defendant would go to jail for.  *Id.* at 37:44-37:47.  Also, after the currency was found, the officers photographed the defendant, *id.* at 40:33-40:40, 41:03-

12

41:13, and his documents, *id.* at 42:50-43:12.  When the suitcase was placed on the hood of the patrol car, the officers directed the defendant to stand in front of the camera and asked him about the suitcase.  *Id.* at 49:37-49:55.  Additionally, the officers retained items from the defendant's pockets.  *Id.* at 57:51-58:33.

After verbally disclaiming the currency, the defendant read and signed the Spanish-language version of the Georgia State Patrol disclaimer form.  T1:105-06; Gov't Exh. 1:05:10-1:05:59; Gov't Exh. 13.[11]  The officers explained that the form stated that the currency did not belong to him.  Gov't Exh. 2 at 1:05:07-1:05:17.  The defendant signed the disclaimer form one hour and five minutes after the stop had begun.  Gov't Exh. 2 at 1:05:58-59.

The traffic stop lasted an hour and eighteen minutes.  *See* Gov't Exh. 2 at 1:18:00.  Prior to its termination, Thompson gave the defendant his "receipt," returned the defendant's "stuff," and asked if he had any questions.  Gov't Exh. 2 at 1:15:17-1:15:25.  The defendant then asked if someone would help him cut a deal or something.

---

[11]     Like the consent to search form, the disclaimer form had both English and Spanish versions.  The English version, which was accurately translated into Spanish, T1:106, indicated that: (1) the defendant disclaimed any interest in the undetermined amount of currency that the patrol had seized; (2) the defendant waived the right to notice of or to plead or answer in the forfeiture action; and (3) the defendant had read, understood, and voluntarily accepted the terms in the form.  *See* Gov't Exh. 13.

AO 72A
(Rev.8/8
2)

Gov't Exh. 2 at 1:15:30-1:15:34.   Thompson told the defendant to call the local authorities when he returned to Texas and that the patrol officers did not know anyone who could help him.  *Id.* at 1:15:44-1:16:30.  At the end of the stop, the defendant was allowed to drive away with his ticket and warning.  T1:108; Gov't Exh. 2 at 1:17:15-1:18:12.

### *Discussion*

The defendant seeks to suppress evidence uncovered and statements made during the September 3, 2008, traffic stop by the Georgia State Patrol.  [*See* Docs. 175, 188]. The parties' post-hearing briefs raise the following issues: (1) whether the Title III intercepts provided independent probable cause to stop and search the truck; (2) whether Officer Thompson had reasonable suspicion or probable cause to stop the defendant's truck for traffic violations; (3) whether the stop was impermissibly prolonged; (4) whether the defendant voluntarily consented to the search of the truck; (5) whether the defendant disclaimed any interest in the seized suitcase and money; and (6) whether the defendant's statements were made in violation of *Miranda*.  [*See* Docs. 285, 287].  These six issues are addressed separately below.

14

A.      *Title III Intercepts, Traffic Stop, and Search*

The government argues that the wire tap evidence provided probable cause for law enforcement to stop and search the defendant's truck, pointing to the following evidence: (1) the content of the telephone intercepts between Daniel and the defendant, including the quiet pickup area, the use of code words, and the money counter sound in the background; (2) the DEA surveillance revealing an exchange in the industrial park; and (3) the post-drop off calls where the defendant asked about the number of packages in coded language.  [Doc. 285 at 17-18].  The government next argues that although law enforcement had not seized drugs or money from the Daniel organization, there is other evidence indicating that illegal activity was to occur on September 3, including: (1) the District Court's decision to authorize the interception of Daniel's cell phone conversations; (2) the DEA's reasons for believing that Mexican-based trafficking organizations were using trucks to transport drugs and money; and (3) the intercepted conversation's use of code words and reference to a quiet location. [*Id.* at 18-20].

The defendant argues that the intercepts and surveillance did not provide probable cause to stop and search the truck for three reasons.  First, he contends that the intercepts themselves are unhelpful because they do not mention money or drugs and

15

they are not tied to any evidence of Daniel's involvement in drugs before September 2008.  [Doc. 287 at 1].  Second, the defendant contends that the surveillance was insufficient because there was no evidence as to what was actually transferred or that law enforcement witnessed any inherently incriminating behavior.  [*Id.* at 2].  Third, the defendant asserts that there was nothing to tie Daniel to illegal drug activity at the time of the surveillance in September 2008.  [*Id.* at 2-4].

The government responds that there was a link between Daniel and the drugs as demonstrated by the District Court's authorization to intercept Daniel's telephone calls. [Doc. 289 at 1].  The government also argues that there was a fair probability that the defendant's vehicle would contain contraband because: (1) law enforcement was aware that drug traffickers were using trucks; (2) the intercept indicated that the defendant was speaking about the delivery of "popsicles" and a quiet location; and (3) surveillance corroborated the phone calls.  [*Id.* at 2].

The Fourth Amendment protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. Amend. IV.  A traffic stop is "a seizure within the meaning of the Fourth Amendment," and is constitutional if it is based on either probable cause or reasonable suspicion.  *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (quoting *United States v. Purcell*, 236 F.3d 1274,

16

1277 (11th Cir. 2001)). "[W]hen a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause." *United States v. Myers*, 207 Fed. Appx. 985, 987, (11th Cir. Nov. 28, 2006) (quoting *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990)). To have probable cause to stop a vehicle, the totality of the circumstances must suggest to a reasonable officer that there is a fair probability that a particular vehicle is carrying contraband or evidence of a crime. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008) ("The police may stop a car if they have probable cause . . . to believe the car is carrying contraband."). Law enforcement similarly has probable cause to search a vehicle "when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Jolly*, 368 Fed. Appx. 17, 20 (11th Cir. Feb. 24, 2010) (quoting *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005)); *see also Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 . . . (1982), authorizes a [warrantless] search of any area of the vehicle in which the evidence might be found."). "Probable cause must be

17

supported by more than a mere suspicion, but does not require the same 'standard of conclusiveness and probability as the facts necessary to support a conviction.' " *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1334 (N.D. Ga. 2009) (Thrash, J., adopting Vineyard, M.J.) (quoting *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003)).

The undersigned concludes that, although the issue is close, there was probable cause to stop and search the vehicle based on the collective knowledge of law enforcement through the wiretap and visual surveillance.[12] First, there is evidence tying the source of the package to illegal activity.   At the time of the traffic stop, law enforcement had not seized drugs or money from Daniel's operation at the time of the defendant's stop, T1:46, but law enforcement had sought and been given authorization to tap Daniel's phones, indicating that there was probable cause to suspect Daniel of

---

[12]     The undersigned notes that there was minimum communication between the various law enforcement entities on the day of the defendant's traffic stop.  Contract employees for the DEA were translating the Spanish conversations to Daniel's phone line into English, and these contractors were in telephonic contact with the surveilling agents.  T1:13.  The DEA observer who was surveilling events from the air was also in contact with the ground surveillance.  T1:18-19.  Finally, Agent Blevins on the ground relayed the information about the phone calls and the exchange to the Georgia State Patrol Officers, T1:22-24, T1:60-61, T2:4.  Given these communications, the undersigned concludes that there were sufficient communications for the Court to examine whether there was probable cause to stop and search the truck based on the collective knowledge of law enforcement.

18

engaging in illegal activity.[13]  *See* T1:12-13.  Stated differently, there was probable

cause to believe that Daniel was linked to criminal activity.  Second, tapped phone

conversations indicated that a meeting would occur under unusual circumstances, as the

defendant sought to meet Daniel in a "quiet" location, which turned out to be along the

side of the road of an industrial complex.  Third, the phone conversations indicated that

a gray car would meet the defendant's tractor trailer (a red Kenmore), T1:14, 18, and

aerial surveillance confirmed that the meeting occurred, T1:20, 49; aerial footage at

9:58-10:37 in Gov't Exh. 1.  Fourth, the conversations and the surveillance indicated

that the car dropped something off with the truck.  T1:20, 49.  Although the aerial

surveillance of the drop off was obscured by tree limbs (aerial footage at 9:58-10:37 in

Gov't Exh. 1), a coded conversation following the Volkswagen's departure indicated

that 39 "popsicles" had been dropped off.  T1:21-22; Def't Exh. 1(i).  Through the

surveillance and these conversations, the undersigned concludes that the officers had

probable cause to believe that contraband was in the truck given the coded language,

----

[13]    *See United States v. Giordano*, 259 F. Supp. 2d 146, 153 (D. Conn. 2003)
(indicating that district court was required to make certain findings before authorizing
the interception of electronic communications, including that: (1) there was probable
cause to believe the individual was committing, had committed, or would commit a
crime; and (2) there was probable cause that the communications concerning the
offense would be obtained through the interception) (citing 18 U.S.C. § 2518(3)(a)-(b)).

AO 72A
(Rev.8/8
2)

the unusual location of the meeting, and the suspicion of Daniel's involvement in illegal

activity.  Since there was continual aerial surveillance of the defendant's truck, there

was no evidence that the defendant jettisoned the "popsicles" delivered to the truck

prior to the Georgia State Patrol's traffic stop.  As such, the undersigned concludes that

the wire tap and aerial surveillance provided probable cause to stop and search the truck

because the totality of circumstances revealed a fair probability that contraband would

be found in the truck.  *See Rodriguez-Alejandro*, 664 F. Supp. 2d at 1339 (citing cases

finding probable cause to stop based on wire tap evidence and finding probable cause

to search tractor trailer based on wiretap information, which revealed, *inter alia*,

conversations detailing transaction, use of coded language, surveillance of vehicles on

the day of the drop off, and continuous surveillance of traffic trailer prior to its stop).[14]

---

[14]    The undersigned recognizes that the *Rodriguez-Alejandro* case is distinguishable in that law enforcement was aware of similar prior exchanges, which had resulted in the seizure of currency in traffic stops, whereas the officers in the instant case were not aware of Daniel's organization using trucks to transport currency at the time of the defendant's stop.  Although the circumstances in *Rodriguez-Alejandro* provide a stronger basis for probable cause, the undersigned does not find that the absence of prior surveillance to be dispositive on the issue of probable cause.  Here, law enforcement was aware: (1) of a meeting at an unusual location (a roadside in an industrial park); (2) that the location was chosen because it was "quiet"; (3) that there was a transfer of some item that was described over the phone in coded language as 39 "popsicles"; and (4) that Daniel was suspected of being involved in illegal activities.  Given the unusual circumstances of the transfer coupled with the surveillance, the undersigned concludes that there was probable cause to believe that the truck contained

20

Based on the above discussion, the undersigned concludes that law enforcement had probable cause to stop and search the defendant's truck based on the communications with the various facets of the September 3, 2008, investigation. Accordingly, the undersigned **RECOMMENDS** that the defendant's motion to suppress evidence be **DENIED**.  The undersigned acknowledges that this issue is close and therefore turns to the government's alternative bases in support of the stop and search, namely that there was reasonable suspicion to believe that the defendant had committed a traffic violation and that the search was conducted pursuant to lawful consent by the defendant.

### B.    *Traffic Stop for Traffic Violations*

The government argues that even if the surveillance did not authorize the stop and search, Trooper Thompson had reasonable suspicion to make a traffic stop on the basis of a traffic violation.  [Doc. 285 at 20-21].  Although the government does not rely on the following too closely violation as a basis for the stop, the government contends that Trooper Thompson's testimony credibly shows that he stopped the defendant on the grounds that the truck tires did not have sufficient tread. [*Id.* at 11 n.1,

---

contraband despite the absence of prior surveillance tying Daniel to drug or currency exchanges under similar circumstances.

21

AO 72A
(Rev.8/8
2)

21-22]. The government also asserts that the traffic stop was not improperly prolonged because the Eleventh Circuit has approved traffic stops of longer durations and the circumstances of the stop show that the length of the stop was reasonable. [*Id.* at 23-24].

The defendant argues that the stop was pretextual because the DEA asked the state patrol to obtain an independent basis for probable cause. [Doc. 287 at 4-5]. Although the defendant recognizes that a pretextual stop will not invalidate a stop, he then argues that the tire issue did not arise until after the stop because Thompson initially informed the defendant that he was stopped for following too closely and the tire issue was an after thought on the video. [*Id.* at 5-6]. The defendant then cites to Thompson's admission that the pounding tire sound could arise from lawful reasons. [*Id.* at 6]. As a result, the defendant asserts that with no valid reason for the stop, the subsequent search and seizure were illegal. [*Id.* at 7]. The defendant also argues that his demeanor during the stop did not give law enforcement reasonable suspicion to believe that criminal activity was afoot so as to justify the stop or give the officers probable cause to search the truck.[15] [*Id.* at 7-9]. Finally, the defendant argues

---

[15] The government no longer contends that the defendant's nervousness was a basis to prolong the stop. [*See* Doc. 285 at 16 n.2]. As a result, the undersigned does not address this argument.

22

that the stop was unlawfully prolonged because the activity during the stop was not related to the investigation into the tire tread violation or the following too closely violation and instead suggests that the officers were stalling. [*Id.* at 10].

The government replies that the following too closely basis for the stop was not "bogus" because Thompson was unaware that an agent was in the 4Runner in front of the defendant's truck. [Doc. 289 at 3]. The government asserts that Thompson credibly testified about hearing the sound of tires beating on the roadway. [*Id.* at 3-4]. Finally, the government notes that the defendant failed to acknowledge the Eleventh Circuit case law upholding traffic stops even longer than those of the defendant's. [*Id.* at 4].

### 1. *Reasonable Suspicion*

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). A traffic stop is reasonable if there is probable cause to believe that a traffic violation has occurred, *id.* at 810, or if the stop is "justified by reasonable suspicion in accordance with *Terry* [*v. Ohio*], 392 U.S. 1 (1968)[,]" *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009); *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). Under *Terry*, police officers may make an

23

investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity.  *Terry*, 392 U.S. at 21. Therefore, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion . . . ." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008); *see also United States v. Boyd*, No. 09-13423, 2010 WL 2891485, *3 (11th Cir. July 26, 2010).

To establish reasonable suspicion, the officer "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Illinois v. Wardlow,* 528 U.S. 119, 123-24 (2000) (quoting *Terry,* 392 U.S. at 27).  As a result, courts examine whether the totality of circumstances demonstrate that the officer has a particularized and objective basis for suspecting legal wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' "  *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).  That the traffic violation is relatively minor is irrelevant to an officer's right to stop the vehicle. *United States v. Hale*,  934 F. Supp. 427, 429 (N.D. Ga. 1996) (citing *Whren*); *see also United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006) (same); *Bolton v. Taylor*,

24

367 F.3d 5, 10 (1ˢᵗ Cir. 2004) (same); *United States v. Murray*, 89 F.3d 459, 461 (7ᵗʰ Cir. 1996) (same).

Although the government has abandoned the defendant's alleged following too closely offense as a basis for stopping the defendant, the undersigned concludes that there was reasonable suspicion to stop the defendant's truck, namely that the truck's tires did not comply with Georgia law's tread requirement. Under Georgia law, all tires "[s]hall have not less than 2/32 inch tread measurable in all major grooves." O.C.G.A. § 40-8-74(e)(1). Trooper Thompson credibly testified that he stopped the defendant's truck in part because he heard the wheels "pounding" when the defendant's truck passed the patrol car on the roadway, which suggested to him that the tire tread was worn. *See* T1:63, 66. Although there were lawful explanations for the noise (T2:19), an officer need not rule out all lawful explanations before having reasonable suspicion to make a stop. *Arvizu*, 534 U.S. at 278 ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."). This testimony tying the "pounding" wheel noise to a violation of O.C.G.A. § 40-8-74 provided reasonable suspicion to stop the truck for a traffic violation.

The defendant argues that the testimony merely was made to cover the pretextual nature of the stop,[16] but the undersigned finds that Thompson was a credible witness as additional evidence corroborates his testimony that he stopped the defendant in part for the tire tread violation.  First, the video of the traffic stop supports Thompson's testimony as he informed the defendant that he stopped him for the tread violation within three minutes after the stop and after answering the defendant's questions about the following too closely basis for the stop.  *See* Gov't Exh. 2 at 2:54-3:00.  Thompson explained to the defendant that he heard the truck tires beating.  *See id.*  Additionally, the undersigned finds additional corroboration from the photographs of the truck tires showing well worn tire tread.  *See* Gov't Exhs. 3-4.  Finally, Thompson ticketed the defendant for these violations during the traffic stop.  *See* Gov't Exh. 5.  As a result, the undersigned concludes that Thompson's stated basis for the stop - - a tire tread violation - - was credible, so Thompson had reasonable suspicion to stop the truck for the tread violations based on the pounding noise of the tires because his testimony tied the pounding noise to insufficient tread.

---

[16]     The defendant correctly recognizes that he cannot successfully argue that the stop was pretextual.  *See United States v. Boyd*, No. 09-13423, 2010 WL 2891485, *3-4 (11th Cir. July 26, 2010) (citing *Whren*, 517 U.S. at 813; *United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997)).

26

The defendant argues that even if there was a legitimate basis for the stop, the Georgia State Patrol officers unreasonably prolonged the stop.  [*See* Doc. 287 at 10]. As a result, the undersigned turns to whether the stop was unreasonable.

2.     *Duration and Scope of the Traffic Stop*

The reasonableness of a traffic stop turns not only on whether the stop was initially justified on reasonable suspicion/probable cause grounds, but also on whether the stop was "reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry*, 392 U.S. at 20); *see also United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006).  Further, "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop."  *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (emphasis in original).  In other words, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled."  *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004).

27

As for the length of a traffic stop, an officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check. *Purcell*, 236 F.3d at 1278.  A delay in obtaining the results of a criminal history check is reasonable where the criminal history check is part of the officer's routine traffic investigation.  *See United States v. Boyce*, 351 F.3d 1102, 1106-07 (11th Cir. 2003).  However, a criminal record request that lengthens a traffic stop beyond what is reasonable may constitute an unreasonable detention.  *Purcell*, 236 F.3d at 1279.  When a defendant consents to a search, the stop becomes a consensual encounter, so courts examine only the length of time prior to consent in determining whether a stop was unreasonably prolonged.  *See United States v. Gonzalez*, 275 Fed. Appx. 930, 933 (11th Cir. May 2, 2008) ("[W]here the driver raises no issue concerning the scope or duration of the search, only the time period between the initial stop and the driver's consent is relevant to the reasonableness of the duration of the traffic stop."); *Purcell*, 236 F.3d at 1279.  The Eleventh Circuit has approved stops lasting 14, 30, and 50 minutes in duration prior to consent.  *Purcell*, 236 F.3d at 1279 (finding stop reasonable that lasted 14 minutes before defendant consented to search); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (approving 50 minute investigatory stop); *see also United States v. Simmons*, 172 F.3d 775, 780 (11th Cir. 1999) (observing that traffic

28

stops longer than 30 or 50 minutes "during which nothing occurred to justify the additional detention, usually require extenuating circumstances to be upheld").

As for the scope of the traffic stop, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009); *Purcell*, 236 F.3d at 1279-80.   The Eleventh Circuit examines the following factors in determining whether the traffic stop ripens into an arrest:

> (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursued their investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention.

*United States v. Fields*, 178 Fed. Appx. 890, 893 (11th Cir. Apr. 26, 2006) (citing *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004)).

The undersigned concludes that the defendant's traffic stop was not unreasonably prolonged prior to his consent to search.  Initially, the 30-minute length of the traffic stop prior to the defendant's consent search was not unreasonably long.  The video shows that the Georgia State Patrol officers' actions during this time were related to the stop.  As part of the stop, Trooper Thompson discussed the violations with the defendant, he obtained the defendant's paper work and truck log, and he ran computer

29

checks as part of the stop.  The 15-minute delay in obtaining information from BLOC

after requesting it was not unreasonable.  *See United States v. Ubaldo-Viezca*, No. 09-

16341, 2010 WL 3895710, *7 (11th Cir. Oct. 6, 2010) ("Although it took 20 to 25

minutes for this information to be verified through BLOC, [the officer] was permitted

to prolong the detention during this time, because he was investigating the driver's

license and vehicle registration.").  Once Thompson received the information from

BLOC, he completed writing the warning and ticket to the defendant.  Nothing about

the circumstances of the stop suggest that the stop was unreasonable based on its

duration.  *See Simmons*, 172 F.3d at 780; *Hardy*, 855 F.2d at 761.

   Also, the undersigned concludes that the stop was not unreasonable because

Trooper Thompson's actions and questions did not expand the scope of the stop.

Again, the video reveals that the officers' actions during the stop were related to the

traffic violations.  Although the defendant suggests that Thompson's behavior exhibited

stalling, he has not pointed to any specific stalling behaviors.  The undersigned's

review of the video did not find any unreasonable actions on the part of the Georgia

State Patrol officers as their actions were related to the stop as follows.  Officer

Thompson first met the defendant outside of the truck, asked for his licence and other

papers, and explained the reasons for the traffic stop.  *See* Gov't Exh. 2 at 1:25-318.

30

Thompson next examined the defendant's paperwork while asking the defendant questions about the violations, the truck load, the destination, the paperwork, the truck's log, the truck company, and the defendant's personal information. *See id.* at 3:35-7:40. Thompson also performed a visual inspection of the driver-side of truck once other officers arrived, *see id.* at 7:44-8:20, after which Thompson explained that he saw another tire violation, *see id.* at 8:25-8:57. Thompson then entered his patrol car, performed the computer checks of the defendant and the truck, and called to get information about the defendant and the truck. *Id.* at 9:20-19:14. While in the patrol car, Thompson started working on the defendant's tickets. *See* T1:85-87. Upon exiting the patrol car, Thompson returned the defendant's documents to him, informed the defendant that he was getting a warning for following too closely, indicated that the defendant was being ticketed for the tire violations, asked the defendant about his citizenship, asked to see his green card, and continued writing the tickets after examining the documents while asking the defendant about his prior encounters with law enforcement. *See* Gov't Exh. at 19:30-23:25. Thompson also asked about firearms, explosives, large amounts of currency, and drugs in the truck. Gov't Exh. 2 at 23:30-24:02. When Thompson received a phone call from BLOC, he returned to the patrol car. *Id.* at 24:02-26:00; T1:91. After exiting the patrol car, Thompson examined

31

the defendant's tire, *id.* at 26:22-27:42, and then went over the court date and ticket with the defendant, *id.* at 27:43-29:23.  He again asked about the presence of contraband in the truck and asked to search the truck.  *See id.* at 29:25-29:32.  This detailed summary of the course of the proceedings demonstrates that there is nothing about the officers' actions to suggest delay, an overly intrusive detention, an unreasonably long detention, or a detention that was outside of the purpose of the stop. Therefore, law enforcement's actions did not exceed the scope of the traffic stop, as the actions and questions were primarily related to the traffic violations.

Since the stop was supported by reasonable suspicion and the duration and the scope of the traffic stop were reasonable, the undersigned concludes that there was no Fourth Amendment violation during in stopping and detaining the defendant. Accordingly, the undersigned **RECOMMENDS** that the defendant's motion to suppress evidence on the basis of an unlawful traffic stop be **DENIED**.

C.     *Consent to Search*

The government contends that the defendant voluntarily consented to the search of his truck.  [Doc. 285 at 24-25].   The government notes that the following circumstances all point to voluntary consent: (1) the defendant was not handcuffed; (2) law enforcement did not unholster their weapons; (3) the defendant understood the

32

troopers; (4) the defendant signed a consent form; and (5) there was no evidence of coercion at the suppression hearing.  [*Id.* at 285].

The defendant argues that his consent was not free and knowing despite his signing of the consent form based on the totality of the circumstances. [Doc. 287 at 11-12].  First, he asserts that he was detained for 30 minutes before giving consent.  [*Id.* at 11].  Second, he contends that the presence of multiple armed officers, a K-9, and activated blue lights were intimidating.  [*Id.*].  Third, the defendant notes that he is primarily fluent in Spanish while Thompson is not.  [*Id.* at 12].  Fourth, the defendant contends that the government failed to produce evidence about the defendant's education or ability to read Spanish.  [*Id.*].  Fifth, the defendant notes that he was not advised of his right to refuse consent and that it is unlikely that an individual would agree to a search if he were carrying drug proceeds.  [*Id.*].

The government replies that the traffic stop was not coercive.  [Doc. 289 at 5].  First, the government notes that every traffic stop involves armed officers and flashing lights.  [*Id.*].  Second, the government asserts that there is no evidence that the defendant was intimidated by the dog.  [*Id.*].

A search conducted pursuant to consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause[.]"  *United States*

33

*v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000) (quoting *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1500-01 (11th Cir. 1993), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  Consent is valid where it is voluntary and not the product of an illegal seizure.  *Id.* (citing *United States v. Robinson*, 625 F.2d 1211, 1219 (5th Cir. 1980)).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989).  In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances.  *United States v. Tovar-Rico,* 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez,* 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry).  Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' "  *United States v. Hidalgo,* 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake,* 888 F.2d 795, 798 (11th Cir. 1989)).  The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent."  *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina,* 391 U.S. 543, 550 (1968)); *see also Florida v.*

AO 72A
(Rev.8/8
2)

*Bostick,* 501 U.S. 429, 438  (1991) ( " 'Consent' that is the product of official intimidation . . .  is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *United States v. Blake*, 888 F.2d 795, 798-9 (11th Cir. 1989).  However, the failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search. *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

The undersigned concludes that the defendant's consent to search the truck was voluntary.  First, the defendant signed a written consent form, T1:92, Gov't Exh. 7, which indicated that he had the right to refuse consent. *See United States v. Geboyan*, 367 Fed. Appx. 99, 101-02 (11th Cir. Feb. 24, 2010) (finding consent voluntary in part where consent form indicated that defendant could refuse to consent).   Second,

35

although the defendant was a native Spanish speaker, the video indicates that he understood English very well given his responsive answers to questions and ability to communicate with the officers in English.  *See generally* Gov't Exh. 2.  The defendant therefore understood Trooper Thompson's request to search the truck.  Additionally, the defendant's reading and signing of the Spanish version of the consent form suggests that he understood Thompson's request.   Third, although the government never produced evidence of the defendant's education level, the video reveals that the defendant was literate, as he read and signed the consent to search and the disclaimer of currency forms.  Fourth, the consent was not a result of coercive police practices. While reviewing the consent form, Trooper Thompson stood away from the defendant. T1:94.   Also, at this time, the troopers had not touched the defendant, had not handcuffed the defendant, had not spoken to the defendant in a threatening or abusive manner, and had not unholstered their firearms.  *See* T1:96, Gov't Exh. 2 at 29:33-31:02.

Fifth, the undersigned is unpersuaded by the defendant's three best arguments supporting his position that the consent was involuntary - - the length of the detention prior to the consent, the presence of three troopers and a K-9, and the unlikeliness that the defendant would consent to a search with the presence of drug proceeds.  Initially,

36

the undersigned notes that the totality of the circumstances weigh in favor of the consent being voluntary based on the factors outlined above.  As for the length of the traffic stop prior to the defendant giving consent, the 30 minutes prior to the obtaining the consent was not extraordinary (as explained above), so the undersigned concludes that the length of the stop did not effect the voluntariness of the consent.  *See United States v. Brown*, 223 Fed. Appx. 875, 880 (11th Cir. Mar. 29, 2007) (finding that 20 to 25 minute period between stop and consent was "not the kind of prolonged detention that might contribute to a coercive environment").

As for the presence of three officers, this police presence does not render the consent involuntary, as the Eleventh Circuit has found searches with more officers present to be consensual.  *See United States v. Garcia*, 890 F.2d 355, 360-62 (11th Cir. 1989) (fourteen officers); *United States v. Espinosa-Orlando*, 704 F.2d 507, 511, 513 (11th Cir. 1983) (four officers).  Additionally, the undersigned concludes that the K-9 presence did not effect the voluntary nature of the defendant's consent because: (1) the video indicates that the dog was not removed from the patrol car until after the consent was given, *see* Gov't Exh. 2 at 29:33-31:02 (consent given), 41:08-41:26 (enthusiastic removal of dog), 42:11 (first appearance of dog on video); and (2) courts have determined that the presence of a dog is not inherently coercive, *see United States v.*

37

*Olivares-Campos*, 276 Fed. Appx. 816, 824 n.7 (10th Cir. May 2, 2008) (finding presence of K-9 was not coercive where the defendant orally agreed to search prior to dog's appearance).

As for the defendant's knowledge of the contraband's presence, this factor does not outweigh the other factors. *United States v. Weeks*, 666 F. Supp. 2d 1354, 1376-77 (N.D. Ga. 2009) (Thrash, J., adopting Vineyard, M.J.) (finding that awareness of contraband's presence did not require finding that consent was involuntary). Also, "[d]espite the obvious irony, . . . suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed." *United States v. Price*, 599 F.2d 494, 503 (2d Cir. 1979). Since the undersigned is unpersuaded by the defendant's arguments and the totality of the circumstances points to the voluntariness of the consent, the undersigned finds that the defendant's consent was voluntary.

Finally, the undersigned observes that this conclusion is bolstered by the Eleventh Circuit case law in which the Court has found consent to be voluntary under far more coercive environments than the one in this case. *See Brown*, 223 Fed. Appx. at 880 (citing cases and finding consent to search voluntary despite fact that officer drew gun as he pulled the defendant's car over and placed the defendant in handcuffs);

38

*Espinosa-Orlando*, 704 F.2d at 512-13 (finding consent to search car was voluntary where the defendant was arrested by four agents near his car at gun point, forced to lay on the grass near the roadway and gave consent while lying down because there was no abusive language used and no threats, the request was made in a conversational tone, and the defendant was not handcuffed or removed from the scene of the stop and detention); *cf. Hidalgo*, 7 F.3d at 1571 (finding consent was voluntary where the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); *Garcia*, 890 F.2d at 360-62 (finding consent to search voluntary where the defendant was arrested by numerous officers, the defendant was patted down for weapons, the officers performed a protective sweep of his house, the officers placed the defendant in handcuffs, the officers gave the defendant his *Miranda* rights, and the officers refused to accept a limited consent).

Based on the above discussion, the undersigned concludes that the defendant's consent to the search of the tractor trailer was voluntary. *Cf. Rodriguez-Alejandro*, 664 F. Supp. 2d at 1337-38 (finding consent to search tractor trailer was voluntary where defendant was cooperative, there was no language barrier, weapons were not drawn, there was no show of force, and there were no objections voiced during the

39

search).  Accordingly, the undersigned **RECOMMENDS** that the Defendant's motion to suppress evidence from the search of the truck be **DENIED**.

D.      *Standing[17] to Suppress Currency*

The government argues that the defendant does not have Fourth Amendment standing to contest the search of the suitcase because he disclaimed an interest in the suitcase and currency.  [Doc. 285 at 26-27].  As evidence of abandonment, the government points to the defendant's signing of the disclaimer form, failure to make a claim on the currency following the seizure, and the lack of evidence at the hearing of an interest in the currency.  [*Id.* at 27].

The defendant responds that the government only showed that the defendant denied ownership of the suitcase, not that he legally abandoned it.  [Doc. 287 at 13]. The defendant argues that the government did not present evidence that the defendant voluntarily discarded or relinquished the property.  [*Id.*].  The defendant asserts that it

_____

[17]      The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing."  *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982).  However, the undersigned will use the word "standing" when referring to whether the defendant has an expectation of privacy because the government has used this term and courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim."  *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

AO 72A
(Rev.8/8
2)

is entirely possible to disclaim ownership of the suitcase while still maintaining a possessory interest.  [*Id.*].  The defendant argues that his knowledge of the suitcase in his truck indicates that he had an interest in the suitcase.   [*Id.* at 13-14].  Finally, the defendant contends that this abandonment issue is a "red herring" because the issue in the case is the search of the truck, not the suitcase.  [*Id.* at 14].

The government replies that the defendant abandoned the suitcase by signing the disclaimer form, leaving the scene without the currency, and never attempting to retrieve the suitcase or currency.  [*Id.* at 5-6].

As mentioned above, the Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. Amend. IV.  To challenge a seizure as violating the Fourth Amendment, a defendant must have "standing," *i.e.*, a legitimate expectation of privacy in the item seized.  *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991).  An individual who abandons property does not have a legitimate expectation of privacy in the property, so he cannot challenge the seizure of the evidence.  *See United States v. Edwards*, 644 F.2d 1, 2 (5th Cir. May 1, 1981) (stating that a defendant who has abandoned property has no reasonable expectation of privacy in the property).  To determine whether a defendant abandons property, "the critical inquiry is whether the person prejudiced by the search [ ] voluntarily discarded, left behind, or otherwise

41

relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Walker*, 199 Fed. Appx. 884, 886 (11th Cir. Oct. 10, 2006) (quoting *United States v. Ramos*, 12 F.3d 1019, 1022 (11th Cir. 1994)).  Courts may infer abandonment from acts, words, other objective facts, and events occurring after the abandonment. *Id.*  Therefore, "an individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police." *United States v. Cofield*, 272 F.3d 1303, 1307 (11th Cir. 2001).  The government bears the burden of proving abandonment of property.  *Id.* at 1306.

The undersigned concludes that the defendant does not have standing to challenge the search and seizure of the suitcase or the seizure of the currency because he does not have a legitimate expectation of privacy in these items.  First, the defendant verbally denied ownership of the suitcase and its contents at the traffic stop.  T1:101-02, 110.  Second, he voluntarily signed a form (in Spanish) disclaiming any ownership in the suitcase or the currency.  *See* Gov't Exh. 13; T1:05-06.  Third, the defendant informed the officers that the suitcase belonged to someone else.  T1:104.  Fourth, the defendant has not challenged the government's assertion that he has not subsequently claimed an ownership interest in the currency.  Given these circumstances, the

42

undersigned concludes that the defendant abandoned any interest in the suitcase or the currency, so he lacks standing to challenge the seizure on Fourth Amendment grounds. *See Cofield*, 272 F.3d at 1307 (holding that defendant abandoned suitcases where defendant denied ownership of bags); *United States v. Hawkins*, 681 F.2d 1343, 1345 (11th Cir. 1982) ("This Court has ruled that disclaiming ownership or knowledge of an item ends a legitimate expectation of privacy in that item."); *United States v. Sims*, 808 F. Supp. 596, 604 (N.D. Ill. 1992) (concluding that defendant did not have standing to challenge seizure of cloth money bag and the currency in the bag where the defendant denied knowledge of the bag's contents and disclaimed an interest in the money); *United States v. Restrepo Naranja*, 643 F. Supp. 154, 160 (S.D. Fla. 1986) (finding that defendant did not have standing to suppress currency where he abandoned any interest in it).

Accordingly, the undersigned **RECOMMENDS** that the defendant's motion to suppress the suitcase and its contents be **DENIED**.[18]

---

[18] To the extent that the defendant's "red herring" statement, [Doc. 287 at 14], is meant to implicate a fruit from the poisonous tree issue, the undersigned notes that evidence obtained as a result of a Fourth Amendment violation may be suppressed as fruit from the poisonous tree, *see Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), even evidence that is subsequently abandoned so long as an illegal search taints the abandonment, *United States v. Beck*, 602 F.2d 726, 729-30 (5th Cir. 1979) (suppressing evidence where abandonment was caused by illegal stop) *United States*

43

E.      *Miranda*

The government asserts that the officers' questioning of the defendant during the traffic stop did not violate the defendant's *Miranda* rights because the defendant was not "in custody" when he was speaking with the Georgia Patrol Officers. [Doc. 285 at 27-29].  Relying on the Eleventh Circuit's unpublished decision in *United States v. Crawford*, 294 Fed. Appx. 466 (11th Cir. Sept. 19, 2008), the government contends there was no custody because: (1) the defendant was not handcuffed or restrained; (2) the officers did not point weapons or use force; and (3) the officers were respectful toward the defendant.  [*Id.* at 28-29].

The defendant argues that his statements should be suppressed because he was not provided a *Miranda* warning while "in custody."  [Doc. 287 at 14-16].  The defendant argues that he was "in custody" because it was not reasonable for the defendant to believe that he was free to leave given the number of troopers on the scene.  [*Id.* at 15-16].  In reply, the government reiterates its reliance on *Crawford*. [Doc. 289 at 6].

---

*v. Caballero-Chavez*, 260 F.3d 863, 867 (8th Cir. 2001); *United States v. Foster*, 566 F. Supp. 1403, 1412 (D.D.C. 1983).  However, the undersigned need not address the fruit from the poisonous tree issue because the undersigned has concluded that the traffic stop was reasonable and the defendant's consent to search the truck was voluntary.

44

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. Based on this Fifth Amendment right against self-incrimination, the Supreme Court adopted a rule in *Miranda v. Arizona*, 384 U.S. 436 (1966), that "certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence." *Dickerson v. United States*, 530 U.S. 428, 431-32 (2000) (holding that the *Miranda* decision is a constitutional decision). "[F]ailure to give the prescribed [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion).

"The right to *Miranda* warnings attaches when custodial interrogation begins." *Acosta*, 363 F.3d at 1148. Thus, "pre-custodial questioning does not require *Miranda* warnings." *Street*, 472 F.3d at 1309. A defendant is in custody for *Miranda* purposes when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)). This is an objective standard from the perspective of a reasonably innocent person. *Street*, 472 F.3d at 1309. Stated somewhat differently, the "in-custody" standard examines whether "under the totality

45

of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987)) (internal quotation marks omitted). Courts examine such factors as whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *Street*, 472 F.3d at 1309 (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)), "as well as the location and length of the detention," *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).[19]

---

[19]   Justice Breyer has stated that the following factors are helpful in evaluating whether an individual is in custody include: "how long the interrogation lasted (brief and routine or protracted?), . . .; how the suspect came to be questioned (voluntarily or against his will?) . . .; where the questioning took place (at a police station or in public?) . . .; and what the officer communicated to the individual during the interrogation (that he was a suspect? that he was under arrest? that he was free to leave at will?)." *Yarborough v. Alvarado*, 541 U.S. 652, 675-76 (2004) (Breyer, J., dissenting) (citations omitted). The Eight Circuit has identified the following six factors as "general indicia . . . in determining whether a suspect is in custody: (1) whether law enforcement informed the suspect the questioning was voluntary, and the suspect was free to leave and was not under arrest; (2) whether the suspect had unrestrained freedom of movement during the questioning; (3) whether the suspect contacted the authorities or voluntarily agreed to official requests to answer questions; (4) whether law enforcement employed strong-arm tactics or deceptive stratagems during questioning; (5) whether the atmosphere of the interrogation was police

46

"Traffic stops . . . are special cases that necessarily implicate a certain minimal amount of restraint on an individual's freedom of movement in order to effectuate their basic purpose." *United States v. Cole*, No. 1:09-cr-412, 2010 WL 3210963, *11 (N.D. Ga. Aug. 11, 2010) (Evans, J.) (citing *Acosta*, 363 F.3d at 1148-49). As a result, *Miranda* warnings are not required when an individual is detained during ordinary traffic stops, *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984),[20] but a *Miranda* warning may be required during some stops, which involve highly intrusive, coercive atmospheres, *see Acosta*, 363 F.3d at 1148.

The undersigned concludes that the defendant's statements are not subject to suppression because the defendant was not "in custody" at the time he spoke with law enforcement. First, that the officers had seized the defendant for a traffic stop does not automatically render the defendant "in custody" so as to require *Miranda* warnings

_____

dominated; or (6) whether law enforcement placed the suspect under arrest at the end of questioning." *United States v. Plumman*, 409 F.3d 919, 924 (8th Cir. 2005).

[20]   There are "two key factors" for this rule. *Acosta*, 363 F.3d at 1149. First, a detention for a traffic stop is "presumptively temporary and brief," which "reduces the danger that the driver through subterfuge will be made to incriminate himself." *Id.* (quoting *Berkemer*, 468 U.S. at 437 & 438 n.27). Second, most motorists who are stopped will not "feel completely at the mercy of the police" because of the public nature of the stop and the circumstances are less "police dominated" than station house interrogation. *Id.* (quoting *Berkemer*, 468 U.S. at 438, 439).

47

before speaking to the defendant.  *See Street*, 472 F.3d at 1309-10 ("[A] seizure does

not necessarily constitute custody for *Miranda* purposes.").  Also, that the defendant

was not free to leave the traffic stop is also of no consequence because a driver and

passenger cannot reasonably expect to leave while an officer investigates a traffic

violation.  *See Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009) (noting that traffic stop

communicates to passenger that he is not free to terminate the encounter and move

about at will);  *Brendlin v. California*, 551 U.S. 249, 257-58 (2007) (noting that traffic

stop "necessarily . . . halts the driver").

Second, the defendant was not in custody prior to his consent to search.

Although the officers were armed, there is no evidence that they ever unholstered their

weapons.  Also, the tone of the officers toward the defendant was polite, and the video

of the traffic stop does not reveal that the officers ever touched the defendant.  The

traffic stop was ordinary prior to the request to search as Thompson reviewed

paperwork, checked for criminal history, and wrote the ticket and warnings.  The stop

and questioning were along the roadway and in front of the public.  At the period prior

to the search, the traffic stop was ordinary and therefore the defendant was not "in

custody."  *See Berkemer*, 468 U.S. at 439-40; *Crawford*, 294 Fed. Appx. at 474

(holding defendant was not in custody during traffic stop where, *inter alia*, the

questioning occurred in public, there were no physical restraints, and the officers did not draw their guns).

Third, the undersigned recognizes that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Berkemer*, 468 U.S. at 440.  The defendant was not, however, "in custody" even after he consented to the search and after the officers found contraband although the issue is extremely close.

The undersigned recognizes that there were aspects of the defendant's seizure following his consent to search that indicated that he was restrained.  For instance, the officers did not give the defendant permission to immediately make phone calls, Gov't Exh. 2 at 37:35, and they photographed the defendant and his papers, *id.* at 40:33, 41:03, 42:50.[21]  They also took items from the defendant's pockets and held these items,

---

[21]     *See Johnson v. Harkleroad*, 104 Fed. Appx. 858, 866-67 & n.4 (4th Cir. July 19, 2004) (noting that photographing defendant "might demonstrate custody" but also noting that there was an "absence of clearly established federal law on whether the photographing of a suspect is an indicia of custody"); *United States v. Crews*, No. 06-cr-418, 2009 WL 426646, *7-8 (W.D. Pa. Feb. 20, 2009) (concluding that refusal to allow defendant to make phone calls was one piece of evidence weighing in favor of a finding that defendant was in custody).

49

*id.* at 57:51.[22]   Additionally, the defendant was aware that the officers found a large amount of currency, Gov't Exh. 2 at 34:29,[23] after he had previously denied its presence, *id.* at 23:26-23:55,[24] and he was questioned about the suitcase while it was in front of him, *id.* at 49:37.   Although these factors weigh in favor of finding the defendant "in custody" at some point following the search of the truck, other evidence diminishes the coercive or restraining nature of these actions.

---

[22]   The undersigned also notes that the defendant's shoes were off during the encounter.  *See* Gov't Exh. 2 at 1:11:24-1:11:36 (defendant holding his shoes in his right hand and then transferring them to his left side).  It is unclear when the defendant removed his shoes and whether the officers ordered them removed or the defendant had voluntarily taken them off.  The defendant has not addressed this evidence, the evidentiary hearing testimony is silent on this facet of the traffic stop, and the traffic stop video is also unhelpful.  Without any argument by the defendant or clear evidence relating to the shoe removal, the undersigned does not address this fact in the "in custody" analysis.  *See United States v. Mwangi*, No. 1:09-cr-107, 2010 WL 520793 at *6 (N.D. Ga. Feb. 5, 2010) (Thrash, J., adopting Baverman, M.J.) (citing cases for proposition that the defendant bears the burden of establishing that he was "in custody").

[23]   *See United States v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007) (concluding that confronting defendant with a bag of contraband that had been seized during the search effected "the tone of the interrogation" when evaluating whether defendant was "in custody").

[24]   The defendant has not identified this evidence as supportive of his "in custody" argument.  [*See* Doc. 287 at 15 (focusing on the "numerous uniformed armed troopers" on the scene)].

50

Immediately after telling the defendant he could not make phone calls, the defendant was told that he was not going to go to jail. Gov't Exh. 2 at 37:44. This statement weighs against finding the defendant to be "in custody" and diminishes the coercive nature of the other actions. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (concluding the defendant was not "in custody" where, *inter alia*, he was informed he was not under arrest); *United States v. Thomas*, 193 Fed. Appx. 881, 886 (11th Cir. Aug. 16, 2006) (same); *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (holding that freedom of movement "coupled with . . . statement to [defendant] that he was not under arrest, is compelling evidence that [defendant] was not in custody"); *see also United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary.") (citation and internal quotation marks omitted).[25] Also, Thompson informed the defendant that he would be able to make a

---

[25]     This is not to say that merely informing a defendant that he is not under arrest prior to questioning gives law enforcement a free pass to ignore *Miranda*. *See United States v. Slaight*, --- F.3d ----, ----, 2010 WL 3431621, *1 (7th Cir. Sept. 2, 2010) (noting police tactic of recasting what would otherwise be a custodial interrogation as a non-custodial interview by telling the suspect that he is not under arrest and that he is free to leave), and *5 (holding defendant was "in custody" despite being repeatedly told that he was not under arrest and was free to leave based on other circumstances);

51

phone call.  *See* Gov't Exh. 2 at 37:35-37:44.  Further, the defendant was told that he was not going to jail prior to the photographs and items being removed from his pockets.  These subsequent statements - - defendant was not going to jail and defendant would be able to make a phone call - - diminish the coercive nature of the stop following the defendant's consent and the officers' search of the truck.[26]  Also, the other factors outlined below weigh against finding the defendant to be "in custody."

During and after the search, the defendant was not handcuffed or otherwise restrained.  *See generally* Gov't Exh. 2; T1:101.  The officers continued to remain polite to him even after they discovered the currency as demonstrated by Thompson's offer to retrieve items from the truck for defendant.  *See* T1:102; Gov't Exh. 2 at 37:30-37:34.  The officers then retrieved articles from the truck for the defendant and allowed him to smoke.  The officers did not brandish their weapons.  T1:102.  The defendant was not placed in the patrol car.  He stood behind his truck, and he was questioned

_____

*United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (finding that telling suspect that he is not under arrest did not carry same weight where the defendant was handcuffed).

[26]     Although the search extended the stop beyond one hour, this factor does not render the defendant in custody because the delay was based on the defendant's consent.  *Cf. Ubaldo-Viezca*, 2010 WL 3895710 at *6 (finding that although stop lasted over an hour, it was extended based on the consent to search).

along the side of the road, in the view of passing traffic. *See Berkemer*, 468 U.S. at 438 (noting that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse"). Additionally, there is no evidence that the defendant "objected to the length of the stop or indicated that he wished to leave." *Ubaldo-Viezca*, 2010 WL 3895710 at *6. *See* T1:103-04. Finally, the defendant was in fact allowed to leave at the conclusion of the traffic stop. These factors along with the statement that the defendant was not going to jail indicate that the defendant was not "in custody" for *Miranda* purposes despite the presence of other coercive practices by the Georgia State Patrol.

Under the totality of the circumstances, the undersigned concludes that although the issue is extremely close, a reasonable person would not feel a restraint on his freedom associated with an arrest (even after the seizure became more coercive following the search of the tractor trailer) and that law enforcement did not violate the defendant's Fifth Amendment rights by questioning the defendant without providing him with *Miranda* warnings.[27] Accordingly, the undersigned **RECOMMENDS** that

---

[27]     *See Ubaldo-Viezca*, 2010 WL 3895710 at *6 (finding defendant was not in custody where defendant: did not object to the length of the stop or wished to leave; voluntarily complied with request to drive to "trooper shop," the tone of the

the defendant's motion to suppress his statements to the Georgia State Patrol officers be **DENIED**.

### Conclusion

For the aforementioned reasons, the undersigned **RECOMMENDS** that the defendant's motions to suppress, [Docs. 175, 188], be **DENIED**.

The undersigned has now ruled upon all pretrial motions as to this defendant, and has not been advised of any problems preventing the scheduling of trial. Therefore, this case as to the defendant named above is **CERTIFIED READY FOR TRIAL**.

---

conversation and interactions were casual; was not touched or restricted in movement; and had no guns pointed at him); *cf. United States v. Perdue*, 8 F.3d 1455, 1464-65 (10th Cir. 1993) (concluding that motorist was in custody where defendant was forced out of his car at gunpoint, questioned while face down on the ground by officers who kept their guns drawn while police helicopters hovered, and police also pointed guns at pregnant fiancee); *United States v. Dolson*, 673 F. Supp. 2d 842, 872-73 (D. Minn. 2009) (finding defendant "in custody" where officer was in the process of confining defendant in patrol car, the stop was on an isolated rural highway, there was no explanation as to why defendant was asked to leave his car, the officer used a harsh tone and began to draw his sidearm when questioned about a pat down, the officer nodded, "no" when defendant asked to call an attorney, and the officer directed defendant's movements). *But see United States v. Richardson*, 700 F. Supp. 2d 1040, 1052 (N.D. Ind. 2010) (concluding that defendant was not "in custody" during a pat down performed in a traffic stop, but was in custody after pat down revealed contraband (narcotics) because reasonable person would not feel free to leave upon discovery); *United States v. Ortega*, 379 F. Supp. 2d 1177, 1186 (D. Kan. 2005) (concluding defendant was "in custody" during traffic stop after defendant was told that drug dog had alerted to scent in his vehicle).

54

However, it is not necessary to place this defendant's case on the trial calendar as matters relating to his co-defendants are still pending before the undersigned.  18 U.S.C. § 3161(h)(6).

IT IS SO CERTIFIED AND RECOMMENDED, this the 25th day of October, 2010.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

55